UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SHERODD CRAFT,

                         *Plaintiff,*

     *-against-*

CITY OF ALBANY; PHILLIPPA P. GARLAND-
WILCOX, as Administrator of the Estate of
KENNETH WILCOX; ANTHONY RYAN and
RONALD MATOS,

                         *Defendants.*

**COMPLAINT**

**JURY TRIAL DEMANDED**

1:26-cv-745 (MAD/DJS)

Plaintiff Sherodd Craft, by his attorneys, Emery Celli Brinckerhoff Abady Ward &

Maazel LLP, alleges as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.      For more than two decades, Sherodd Craft was stripped of his freedom for a crime

he did not commit.

2.      In 2002, Mr. Craft was wrongfully convicted of murdering Shakira Chambers and

sentenced to 50 years to life in prison.

3.      The investigation into Chambers's death was led by Defendants Albany Police

Department ("APD") and Detectives Kenneth Wilcox, Anthony Ryan, and Ronald Matos.

4.      Defendant City of Albany (the "City") knew that Detectives Wilcox, Ryan, and

Matos engaged in misconduct in at least four murder investigations over the previous five years.

5.      This misconduct included fabricating false witness statements, fabricating false

confessions from suspects, falsifying police reports, and committing perjury in court.

6.      In fact, at the same time Defendant Wilcox was fabricating evidence against Mr.

Craft, he was also participating in a sprawling mortgage fraud scheme.

1

7.      Despite knowing that Wilcox was engaging in such misconduct, his superiors at the APD failed to properly supervise or discipline him. Instead, they allowed him to continue to interrogate and elicit false statements from witnesses and suspects and fabricate evidence in major criminal cases, including homicide investigations.

8.      In Mr. Craft's case, Detectives Wilcox, Ryan, and Matos fabricated key evidence by coercing two witnesses into falsely naming Mr. Craft as the person who shot Shakira Chambers and Javon Morton.

9.      The Detectives separately fabricated a false confession from Mr. Craft. When Mr. Craft refused to falsely implicate himself during an overnight interrogation at the precinct, Detective Wilcox fabricated an oral confession that Mr. Craft never made and falsely documented it in a police report.

10.      Wilcox, Ryan, and Matos then suppressed all evidence of their evidence fabrication, depriving Mr. Craft of critical exculpatory and impeaching evidence at trial.

11.      On March 13, 2025, Mr. Craft moved to vacate his conviction. The Albany County District Attorney's Office consented to the motion.

12.      On April 23, 2025, Albany County Court Judge William Little granted Mr. Craft's motion and released him from custody.

13.      Finally, after more than 24 years imprisonment, Mr. Craft regained his freedom and reunited with his family.

14.      Now, Mr. Craft brings this suit to hold the City and the Detectives who were complicit in the violation of his constitutional rights and wrongful conviction accountable for their actions.

**PARTIES**

15.    Plaintiff Sherodd Craft is a United States citizen and resident of the State of Georgia.

16.    Mr. Craft complied with the requirements of New York General Municipal Law Section 50-i. On July 3, 2025, Mr. Craft served a Notice of Claim on the City of Albany, within the time required by New York General Municipal Law Section 50-e.

17.    On January 21, 2026, the City conducted an examination of Mr. Craft pursuant to New York General Municipal Law § 50-h.

18.    At least 30 days have passed since the Notice of Claim was served on the City and the 50-h hearing was conducted, and adjustment and payment thereof has been neglected or refused by the City.

19.    Defendant City of Albany is a municipality that is a political subdivision of the State of New York. Under its authority, the City operates the APD, through which it employs police officers. At all times relevant to this Complaint, the City was responsible for the policies, practices, and customs of the APD.

20.    Defendant Phillippa P. Garland-Wilcox is the Administrator of the Estate of Detective Kenneth Wilcox. At all times relevant to this complaint, Detective Wilcox was employed as a police officer at the APD, and, as such, he was employed by the City, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Albany and the State of New York.  Detective Wilcox died in 2006.

21.    At all times relevant to this Complaint, Defendant Detective Anthony Ryan was employed as a police officer at the APD, and, as such, he was employed by the City, acting under color of law and in his individual capacity within the scope of his employment pursuant to the

3

statutes, ordinances, regulations, policies, customs, and usage of the City of Albany and the State of New York.

22.    At all times relevant to this Complaint, Defendant Detective Ronald Matos was employed as a police officer at the APD, and, as such, he was employed by the City, acting under color of law and in his individual capacity within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Albany and the State of New York.

## JURISDICTION AND VENUE

23.    This action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. §§ 1983 and 1988.

24.    This jurisdiction of the Court is predicated upon 28 U.S.C. §§ 1331 and 1343(a)(1)–(a)(4).

25.    Pursuant to 28 U.S.C. §139l(b), venue is proper in the Northern District of New York, the judicial district in which multiple Defendants reside, where the City of Albany conducts its business, and in which all events giving rise to the claim took place.

## JURY DEMAND

26.    Plaintiff demands trial by jury in this action.

## FACTS

*Sherodd Craft*

27.    Sherodd Craft was born in 1979 and grew up in Albany, New York.

28.    Having grown up in both downtown and uptown Albany, Mr. Craft was very involved in his community growing up.

29.    Mr. Craft was particularly active in Albany's baseball community, where he was a local star for many years. He had ambitions of coaching in the local league one day.

4

30.    Mr. Craft was also involved in the music scene and sought to pursue a career in hip hop and rap music.

31.    In 2001, Mr. Craft was taking classes at Hudson Valley Community College to get his high school diploma and get a head start on obtaining college credit.

32.    Mr. Craft also had two daughters who were one and two years old.

33.    At the age of 21, Mr. Craft was a young father with his entire life ahead of him. He wanted to provide for his daughters and be involved in their lives as they grew up.

***Broderick Greene Is Shot and Killed in the Early Morning on June 3, 2001***

34.    In the early morning hours of June 3, 2001, Broderick "Juna" Greene was shot and killed outside of a store on Colonie Street in Albany.

35.    Samuel Frazier was with Mr. Greene at the time of his murder.

36.    Mr. Greene and Mr. Frazier were from the "uptown" area of Albany.

37.    Police believed that the shooter who killed Juna was from "downtown" Albany.

38.    Sherodd Craft first heard about Mr. Greene's death during the day on June 3, 2001.

39.    At the time, Mr. Craft's girlfriend of two years, Erica Cancer, had recently broken up with Mr. Craft.

40.    In an attempt to mend their relationship, Mr. Craft called Ms. Cancer's mother's house at around 9:30 p.m. on the evening of June 3, 2001.

41.    At the time, Ms. Cancer's 14-year-old cousin, Adrien Teasley, was living with Ms. Cancer and her mother.

42.    During his two-year relationship with Ms. Cancer, Mr. Craft spent a considerable amount of time at Erica's mother's home where Erica and Adrien lived.

43.     As a result, Mr. Craft became very close to Adrien.

44.     When Mr. Craft called Ms. Cancer's house that night, Adrien picked up the phone and spoke with Mr. Craft for around 30 minutes.

45.     Mr. Craft and Adrien mostly talked about Erica and the breakup and how down he was about the relationship being over.

46.     During the call, Adrien asked Mr. Craft if he knew who shot Juna.

47.     Adrien was friends with Juna and upset about his death.

48.     Mr. Craft told Adrien that he didn't want to speak about Juna's death over the phone.

49.     Mr. Craft then told Adrien that if he didn't see him again, because Erica had ended their relationship, he loved him.

50.     Before hanging up, Mr. Craft told Adrien to stay in the house that night because he knew Adrien sometimes snuck out of the house and he was concerned for Adrien's safety, given that Juna had just been shot and killed earlier that day.

51.     Mr. Craft then said goodnight to Adrien and hung up the phone.

52.     At around 10:00 p.m., Mr. Craft called Ms. Cancer on her cellphone.

53.     Mr. Craft and Ms. Cancer spoke for about 30 minutes and discussed whether they should get back together.

***After Shakira Chambers Is Killed in the Evening on June 3, 2001, Detectives Wilcox and Ryan Ignore Contrary Evidence and Focus on Only One Suspect: Sherodd Craft***

54.      At around 10:30 p.m. on June 3, 2001, Javon Morton, Shakira Chambers, and Stephanie Van Debogart were sitting outside on the corner of Elizabeth Street and Third Avenue in Albany.

55.    Two unidentified individuals drove up to the corner, jumped out of their car, and began shooting at Mr. Morton, Ms. Chambers, and Ms. Van Debogart.

56.    The shooters wounded Mr. Morton and killed Ms. Chambers.

57.    The shooters then got back in their car and drove away.

58.    APD Detectives Kenneth Wilcox and Anthony Ryan were the lead investigators assigned to investigate the shooting.

59.    From the beginning, Detectives Wilcox and Ryan fixated on the first tip they received in the case and refused to consider other suspects in the face of compelling contradictory evidence. That first tip erroneously led them to Sherodd Craft.

60.    On June 4, 2001, the day after Ms. Chambers was shot and killed, APD Detectives Gustavo Flores and Joseph Iwaniec went to Philip Livingston Middle School in Albany after the school's security officer called the police to report that some students may have information regarding the murder of Ms. Chambers.

61.    At the school, Detectives Flores and Iwaniec spoke with a minor referred to in the APD investigative file as C12.

62.    On information and belief, C12 was Adrien Teasley.

63.    According to Detective Iwaniec's June 4, 2001, investigative report, Teasley told Iwaniec that one and a half months before the Chambers murder, Mr. Craft gave him a handgun, which he then retrieved a few weeks later, and Mr. Craft had been friends with Broderick "Juna" Green.

64.    The police had no evidence or information connecting that gun and the gun that was used to shoot Shakira Chambers and Javon Morton.

65.    On June 6, 2001, Detectives Flores and Iwaniec brought Erica Cancer to the APD station.

66.    According to Detective Iwaniec's June 6, 2001 supplemental report, Ms. Cancer told him that a few weeks before the Chambers murder, someone gave her a bag with a gun, which she then stowed at a cousin's house until Mr. Craft called Ms. Cancer a couple weeks later and told her that someone was going to come by and pick up the bag.

67.    Again, the police had no evidence or information connecting that gun and the gun that was used to shoot Shakira Chambers and Javon Morton.

***Defendants Ignore a Break in the Case from an Eyewitness, Implicating a Different Individual as the Perpetrator***

68.    Based on the information in the investigative reports submitted by Detective Iwaniec regarding ¶¶ 60-67, *supra*, Detectives Wilcox and Ryan engaged in a campaign to arrest and convict Mr. Craft for the Chambers murder—even when faced with stronger contradictory evidence.

69.    On June 7, 2001, Desmond Tatro came into the Albany Police Department to report details regarding the Chambers murder.

70.    Mr. Tatro was interviewed by Detective Wilcox and another APD detective.

71.    In his interview, Mr. Tatro reported that he was driving towards the corner of Elizabeth Street and Third Avenue shortly after the murder occurred.

72.    Mr. Tatro told the detectives that he saw two individuals running towards and then getting into a car parked on Cuyler Street.

73.    Mr. Tatro said the car quickly pulled away and drove towards him.

74.    Mr. Tatro noticed that the driver of the car had a hood pulled up over his head, but he did not recognize him.

8

75.     Mr. Tatro did, however, recognize the passenger in that car as Anthony "Up Top" Malloy.

76.     After the car drove past Mr. Tatro, Mr. Tatro watched the car turn onto Second Avenue.

77.     Mr. Tatro told the detectives that he knew that Mr. Malloy's grandmother lived on Second Avenue.

78.     After seeing the police cars at the crime scene, Mr. Tatro hurried towards the corner.

79.     Upon Mr. Tatro's arrival at the scene, Mr. Morton ran up to Mr. Tatro and told him that he was shot by a man "who lived up the block."

80.     Mr. Tatro told the detectives that he understood Mr. Morton to be referring to Anthony Malloy.

81.     Mr. Tatro explained that, the day after the Chambers murder, he was at the mall with his girlfriend when he was approached by Mr. Malloy and two others.

82.     Mr. Malloy told Mr. Tatro: "It could have been you."

83.     In response, Mr. Tatro grabbed his girlfriend and hurried into the mall.

84.     Upon leaving the mall, Mr. Tatro noticed that someone had keyed his car.

85.     Despite this clear eyewitness identification of Anthony Malloy as one of the perpetrators, no one at the APD took any action to investigate this lead.

***Detectives Wilcox and Ryan Coerce Adrien Teasley into Falsely Implicating Mr. Craft***

86.     On June 18, 2001, Detectives Wilcox and Ryan interrogated 14-year old Adrien Teasley at the APD station.

9

87.    Adrien was alone with Detectives Wilcox and Ryan throughout the interrogation and was there without the knowledge or permission of his legal guardian, Adrian K. LaMarche.

88.    While interrogating Adrien, Detectives Wilcox and Ryan coerced him into signing a witness statement—fabricated by Detectives Wilcox and Ryan—falsely incriminating Mr. Craft.

89.    Specifically, Detectives Wilcox and Ryan coerced Adrien into saying that Mr. Craft had told him that he was going downtown to fight and that Mr. Craft had revenge in his heart, even though Adrien knew these details were not true.

90.    Detectives Wilcox and Ryan then pressured Adrien to sign a statement that included the following:

- At 9:00 p.m. on June 3, 2001, Sherodd Craft called Adrien Teasley's house and Adrien picked up the phone.

- After saying hello to Mr. Craft, Adrien immediately asked him who had shot Juna. Mr. Craft asked Adrien not to ask him about that over the phone.

- Mr. Craft asked Adrien about Ms. Cancer.

- Mr. Craft told Adrien not to leave the house because him and Mickey might be "rolling deep downtown."

- Mr. Craft told Adrien if he didn't see Adrien again, he loved him.

- On the morning of June 4, 2001, Adrien told Lou Renna, the security chief of his school, that Mr. Craft had left a TEC-9 at his house a month before the Chambers murder.

- Adrien put the gun in the ceiling on the second floor. Adrien held onto the gun for around a week before Mr. Craft came back and picked up the gun.

10

- A week after Mr. Craft picked up the gun from Adrien's house, Adrien's cousin told Adrien that he had a gun at his house.

- Adrien went to his cousin's house and recognized the gun as the same one that Mr. Craft had picked up from Adrien's house the week prior.

- Adrien and his cousin fired the gun in the backyard of the house.

- Adrien also told Mr. Renna that Mr. Craft carried a silvered-colored automatic pistol.

- Adrien said he held the gun once while wearing gloves.

91.    This coerced statement was fabricated by Detectives Wilcox and Matos, who added false facts to make the statement align with their theory against Mr. Craft.

***Detectives Wilcox and Ryan Coerce Anthony Malloy into Falsely Implicating Mr. Craft***

92.    Also on June 18, 2001, Anthony Malloy was arrested and taken to the APD station on an unrelated charge.

93.    Desmond Tatro had previously identified Mr. Malloy as a suspect in the Chambers murder. *See supra* ¶¶ 69-85.

94.    Detective Ryan informed Detective Wilcox that Malloy was in APD custody.

95.    Detectives Wilcox and Ryan proceeded to interrogate Malloy for four hours regarding the Chambers murder.

96.    Initially, Mr. Malloy told Wilcox and Ryan that he didn't know anything about the Chambers murder.

97.    Mr. Malloy did not have an alibi for the Chambers murder.

98.    After hours of unrelenting questioning from Wilcox and Ryan, Mr. Malloy signed a false, self-serving statement.

99.    Detective Ryan and Detective Matos are both listed as witnesses to Mr. Malloy's statement.

100.    In his statement, Mr. Malloy claimed that at Broderick Greene's memorial service, Mr. Craft admitted to Mr. Malloy that he and Alfonzo Davis committed the Chambers murder.

101.    In exchange for this statement, the APD dropped all charges against Mr. Malloy.

102.    Detectives Wilcox and Ryan did not conduct any further investigation or make any attempts to corroborate Mr. Malloy's statement.

103.    As discussed *infra* at ¶¶ 157-162, years following Mr. Craft's and Mr. Davis's convictions, Mr. Malloy posted a video on YouTube recanting the statement he made to Detectives Wilcox and Ryan.

***Detective Wilcox Physically Abuses Mr. Craft During an Hours-long Interrogation and Then Fabricates a False Confession Tying Mr. Craft to the Chambers Murder***

104.    On July 23, 2001, Detective Ryan arrested Mr. Craft for purportedly possessing a firearm outside of an apartment at 7 Lark Street.

105.    Upon arriving at 7 Lark Street, Detective Ryan observed as Anthony Malloy tried to escape out of the rear second floor window.

106.    After forcing the apartment's tenant and her children to exit the apartment, a detective near the front door called out to Mr. Craft and Mr. Malloy.

107.    Mr. Craft walked out the front door, and Detective Ryan grabbed Mr. Craft, forced him to the ground, handcuffed him, and checked him for weapons.

108.    Detective Ryan found no weapons on Mr. Craft.

109.    Nevertheless, Detective Ryan still detained Mr. Craft and transported him to the police station.

12

110. APD did not arrest Mr. Malloy, letting him leave of his own accord.

111. After Mr. Craft arrived at the station, Detective Wilcox proceeded to interrogate Mr. Craft.

112. Detective Wilcox initially asked Mr. Craft whether he knew any information about the Chambers murder.

113. Mr. Craft did not know anything about the Chambers murder.

114. Accordingly, Mr. Craft told Detective Wilcox he did not have any information about the Chambers murder.

115. After a while, Detective Wilcox began telling Mr. Craft that other people were accusing him of participating in the Chambers murder.

116. Mr. Craft told Detective Wilcox that he wasn't involved.

117. Detective Wilcox became enraged and started calling Mr. Craft a "punk" and "coward."

118. Suddenly, Detective Wilcox grabbed Mr. Craft by the neck and slammed his head into the wall.

119. Mr. Craft maintained that he was not involved in the Chambers murder, even after Detective Wilcox's assault.

120. After three hours of Mr. Craft maintaining his innocence, Detective Wilcox left the interrogation room and falsely told Detective Matos that Mr. Craft had confessed to the Chambers murder by saying "I didn't mean to kill the girl."

121. At no point during his interrogation by Detective Wilcox did Mr. Craft say he "didn't mean to kill the girl" or otherwise confess to committing the Chambers murder.

122.    Frustrated by Mr. Craft's continued assertion of innocence, Detective Wilcox fabricated this false confession in order to arrest, prosecute, and convict Mr. Craft.

123.    No one else was in the interrogation room when Mr. Craft allegedly made this oral confession to Detective Wilcox.

124.    Mr. Craft's purported oral confession is almost identical to the false confession Detective Wilcox fabricated and forged in the Anthony Taylor case. *See infra* ¶¶ 217-229.

125.    Detective Wilcox fraudulently documented the fabricated oral confession by creating an Oral Admission Report.

126.    Following Detective Wilcox's submission of an Oral Admission Report memorializing the false confession, Detectives Wilcox and Matos arrested Mr. Craft for the Chambers murder.

***Detectives Wilcox and Ryan Fabricate Corroborating Evidence by Coercing Samuel Frazier into Falsely Implicating Mr. Craft***

127.    On July 27, 2001, a grand jury formally indicted Mr. Craft on charges of Murder in the Second Degree, P.L. §125.25(1) (intentional murder), Murder in the Second Degree, P.L. §125.25(2) (depraved indifference murder), Attempted Murder in the Second Degree, P.L. §110/125.25(1), and Criminal Possession of a Weapon in the Third Degree, P.L. §265.02(4) (for the loaded firearm he allegedly possessed in May 2001).

128.    Shortly after the grand jury proceedings, Erica Cancer left Albany after being repeatedly harassed by Detective Wilcox, who was strongarming her to testify against Mr. Craft.

129.    On November 1, 2001, Samuel Frazier was arrested on a felony charge of criminal sale of a controlled substance.

130.    Upon learning that Mr. Frazier was in custody, Detectives Wilcox and Ryan went to interrogate him.

14

131.    As Mr. Frazier later revealed in a 2024 statement, he was high throughout the interrogation, of which Wilcox and Ryan were aware.

132.    Hours into the interrogation, Detective Wilcox drafted a two-page statement for Mr. Frazier to sign, falsely stating that on two separate occasions, Mr. Craft and Alfonzo Davis separately confessed to Mr. Frazier that they committed the Chambers murder.

133.    The statement Detective Wilcox drafted for Mr. Frazier claimed that Mr. Craft walked into a house that Mr. Frazier was visiting, struck up a conversation, and spontaneously admitted his involvement in the Chambers murder.

134.    Mr. Frazier signed the statement.

135.    Wilcox and Ryan then allowed Frazier to walk out of the precinct, despite the fact that he had been arrested earlier that day for felony criminal sale of a controlled substance.

136.    On December 11, 2001, Mr. Craft moved to suppress the false oral confession Detective Wilcox fabricated against him.

137.    Detective Wilcox falsely testified that Mr. Craft orally confessed to killing Ms. Chambers and failed to admit that he assaulted Mr. Craft during the interrogation.

138.    Judge Thomas A. Breslin denied Mr. Craft's motion to suppress his purported confession.

139.    On August 21, 2002, Detective Wilcox interrogated Alfonzo Davis in connection with the Chambers murder.

140.    In his fabricated statement, Anthony Malloy stated that Mr. Craft told him that Alfonzo Davis was the other perpetrator of the Chambers Murder.

15

141.    During this interrogation, Detectives Wilcox and Ryan coerced Mr. Davis into signing a false confession, supplying Mr. Davis with facts about the Chambers murder that Mr. Davis was previously unaware of.

142.    Detectives Wilcox and Ryan used physical force and threats to coerce Mr. Davis into signing the false confession.

143.    On April 30, 2003, Erica Cancer, who had returned to Albany the previous fall, was picked up by Detective Wilcox and held on a material witness order in the Albany County Jail until she agreed to testify at Mr. Craft's trial.

***Mr. Craft Is Convicted Based on Evidence Fabricated by Defendants***

144.    Mr. Craft's trial commenced on May 12, 2003.

145.    Detective Wilcox, Detective Ryan, Detective Iwaniec, Adrien Teasley, Erica Cancer, and Samuel Frazier, among others, testified for the prosecution.

146.    The prosecution did not call Anthony Malloy as a witness but nevertheless managed to get Mr. Malloy's fabricated signed statement admitted into evidence, through Detective Ryan's false testimony.

147.    During his direct examination, Mr. Frazier stated that he could not remember any of the details of his purported conversation with Mr. Craft. Assistant District Attorney Joseph Muria had to repeatedly refresh Mr. Frazier's recollection regarding his statement until Mr. Frazier effectively read from his fabricated statement on the witness stand.

148.    The prosecution presented no physical or forensic evidence tying Mr. Craft to the crime.

149.    None of the eyewitnesses of the shooting identified Mr. Craft as one of the perpetrators of the shooting.

150. All key pieces of evidence in the prosecution's case—Adrien's statement, Mr. Frazier's statement, Mr. Malloy's statement, and Mr. Craft's purported confession—had been fabricated by Detectives Wilcox, Ryan, and Matos.

151. On May 19, 2003, a jury convicted Mr. Craft of depraved indifference murder, P.L. §265.25(2), and attempted murder in the second degree, P.L. §110/125.25(1). He was acquitted of the intentional murder and criminal possession of a weapon charges.

152. On July 17, 2003, Judge Joseph C. Teresi sentenced Mr. Craft to an aggregate 50 years to life in prison.

153. On January 25, 2007, the Appellate Division, Third Department affirmed Mr. Craft's conviction.

154. On June 25, 2007, the Court of Appeals denied leave to appeal.

155. Despite these obstacles, Mr. Craft continued to maintain his innocence for the next eighteen years.

156. Despite being robbed of his freedom, Mr. Craft led as productive a life as possible in the prison system, where he earned his GED, diligently worked as a porter, carpenter, and teacher's assistant, and completed many vocational and educational programs.

***Mr. Malloy and Mr. Frazier Recant and Reveal That Their Statements Implicating Mr. Craft Were False and Fabricated by Detectives Wilcox, Ryan, and Matos***

157. In 2013, a decade after Mr. Craft was wrongfully convicted, Mr. Malloy recanted his statement in a video posted on YouTube.

158. In this video, Mr. Malloy stated that Detectives Wilcox and Ryan had pressured him into implicating Mr. Craft and Mr. Davis in the Chambers murder.

159. Specifically, Mr. Malloy stated that Detectives Wilcox and Ryan "brought Sherodd Craft['s] name to [him] and they told [him] that they had information" about Mr. Craft's

17

involvement in the Chambers murder. Mr. Malloy proceeded to tell the detectives "no he didn't do it."

160.    Mr. Malloy stated that after leaving him alone for a bit, Detective Wilcox came back into the interrogation room and began threatening to charge Mr. Malloy with murder. Detective Wilcox told Mr. Malloy that if he signed the statement that Wilcox had just prepared, he would let Mr. Malloy go free.

161.    Fearful of being charged with murder, Ms. Malloy signed the statement.

162.    Throughout the encounter, Mr. Malloy stated that Detective Wilcox "made [it] very clear to [him] that [Wilcox] didn't care who went to jail for [the Chambers murder.]"

163.    On September 14, 2024, Mr. Frazier signed an affidavit in which he also recanted his signed statement and trial testimony.

164.    In his affidavit, Mr. Frazier stated:

> Detective Wilcox prepared a statement for me to sign. The statement claimed that Sherrod Craft confessed to me that he was involved in a shooting. This statement was completely false. All of the information in the statement was provided by Detective Wilcox. Sherrod Craft never told me that he had been involved in any shooting. I never told Detective Wilcox that Sherrod Craft had admitted any involvement in a shooting to me.

165.    Mr. Frazier further stated that he had been arrested on a narcotics charge immediately before Detective Wilcox interrogated him and was high throughout the interrogation. Mr. Frazier admitted that he only signed the statement because Wilcox had agreed to let him out of jail if he signed it.

166.    In recent years, as the breadth of Detective Wilcox's misconduct became public knowledge, the Albany County District Attorney's office began reviewing cases involving Detective Wilcox.

18

167.    On May 25, 2023, Mr. Davis—Mr. Craft's co-defendant—moved for his conviction to be vacated pursuant to CPL §§ 440.10(1)(d), (g), (h).

168.    On March 20, 2024, on consent of the Albany County District Attorney's office, Judge William T. Little of the Albany County Court granted Mr. Davis's motion and vacated his conviction.

169.    On June 13, 2024, Mr. Davis pled guilty to Criminal Possession of a Weapon in the Second Degree for which he received a determinate sentence of 8.5 years.

170.    On March 28, 2024, Mr. Craft moved pursuant to C.P.L. 440.10(1)(g) to vacate his conviction.

171.    Shortly thereafter, the Albany County District Attorney offered to consent to Mr. Craft's motion to vacate his conviction for depraved indifference murder and attempted murder if Mr. Craft would enter an *Alford* plea to the lesser charge of attempted assault in the second degree, a class E non-violent felony, with a sentence of one and one-third to four years.

172.    Pleading to this lesser charge would secure Mr. Craft's immediate release from prison.

173.    Mr. Craft had already served nearly 24 years behind bars and wasn't even halfway through his original sentence. He had been deprived of raising his daughters, pursuing a career, and enjoying his liberty for over two decades.

174.    Presented with the opportunity to accept an *Alford* plea and be immediately released, Mr. Craft accepted the deal.

175.    On April 23, 2025, upon consent of the prosecution, Judge Little of the Albany County Court granted Mr. Craft's C.P.L. 440.10 motion. *See People v. Craft*, No. IND-70034-01/001 (Apr. 23, 2025).

19

176.     On the same day, Mr. Craft entered an *Alford* plea to attempted assault against Javon Morton and was released from prison.

177.     During the *Alford* plea allocution, Mr. Craft maintained his innocence to the crime of attempting to assault Javon Morton despite entering a guilty plea.

178.     On June 18, 2025, Judge Little sentenced Mr. Craft to a term of one-and-one-third to four years in prison; time he had already served.

***Defendants Robbed Mr. Craft of What Should Have Been the Prime of His Life***

179.     As a direct result of Defendants' actions and omissions, which were willful, wanton, reckless, and/or performed with deliberate indifference to Mr. Craft's rights, Mr. Craft sustained injuries and damages, which are ongoing and will continue into the future.

180.     Mr. Craft's injuries include but are not limited to: the loss of freedom; emotional distress and mental anguish; loss of family relationships; loss of income and career opportunities; legal expenses; humiliation and severe reputational damages; and the loss of enjoyment of life, including personal fulfillment, romantic relationships, career opportunities, and personal growth and development.

181.     Defendants robbed Mr. Craft of his fundamental rights to life, liberty, and the pursuit of happiness.

***In the Years Leading Up to Mr. Craft's Wrongful Conviction, Detective Wilcox Repeatedly Attempted to Wrongfully Convict Multiple Individuals with Impunity***

182.     Detective Wilcox's evidence fabrication in the Chambers murder investigation was not an isolated incident of misconduct: it was consistent with Detective Wilcox's longstanding practice, which he had used to arrest suspects and pursue and secure convictions in other cases for years leading up to Mr. Craft's wrongful conviction.

183.    The City of Albany was aware of Detective Wilcox's history of misconduct. As early as 1998, Detective Wilcox's superiors at the City knew that he was a corrupt detective obsessed with closing cases no matter the cost, including by fabricating evidence and coercing witnesses in at least four other homicide cases.

184.    Despite knowing of Detective Wilcox's practice of coercing witnesses and fabricating evidence during homicide investigations, the City failed to take any steps to prevent Detective Wilcox's continued constitutional violations, which led to Detective Wilcox following this same practice of witness coercion and evidence fabrication during his investigation of the Chambers homicide.

185.    Prior to Mr. Craft's arrest in 2001, Detective Wilcox fabricated evidence in at least the following cases.

**1996: Corey Young**

186.    On February 13, 1995, two men robbed Terrell Strickland and Marlowe Traynham on the corner of Second Street and Oak Street in Albany.

187.    While fleeing from the scene, the men exchanged gunfire with two police officers who responded to the scene. One of the perpetrators was shot by the police, leaving behind a trail of blood.

188.    The perpetrators escaped apprehension on the date of the incident.

189.    Crime scene detectives collected blood samples left by the perpetrator that was shot.

190.    For fourteen months, the APD's investigation into the robbery and attempted murder languished.

191.    Detective Kenneth Wilcox joined the investigation in April 1996 and began targeting Corey Young, who had not previously been considered as a suspect.

192.    Between April 1996 and February 1998, Detectives Wilcox and Ryan collected seven statements allegedly implicating Mr. Young in the robbery. Four of these witness statements claimed that Mr. Young confessed that he was the perpetrator who had been shot by police while fleeing from the scene of the robbery.

193.    Following Mr. Young's arrest, APD tested his DNA against blood samples collected at the crime scene. The DNA testing *excluded* Mr. Young as the perpetrator who had been shot by police during the robbery.

194.    The DNA results completely undermined the credibility of the four witness statements that claimed Mr. Young confessed to being the perpetrator who had been shot during the robbery.

195.    As a result, APD and the City of Albany knew or should have known that Detectives Wilcox and Ryan were fabricating and/or coercing false witness statements to implicate Mr. Young.

196.    Nevertheless, based on three other false witness statements obtained by Detectives Wilcox and Ryan, the Albany District Attorney's Office proceeded with their prosecution of Mr. Young.

197.    Out of the seven original witnesses, only three—Abdullah McKnight, Eugene Morrow, and Samuel Recard—testified at Mr. Young's trial. All three of these witnesses were either in police custody or imprisoned at the time of their interrogations by Detectives Wilcox and Ryan.

198.    All three of these witnesses have since recanted their statements.

22

199. Abdullah McKnight stated that Detective Wilcox coerced him into signing a statement against Mr. Young by threatening to implicate Mr. McKnight in the robbery. Mr. McKnight was expecting a child, so he signed a statement that Wilcox typed. The statement detailed how on the day that the shooting took place, Mr. Young told Mr. McKnight that he and others were planning a robbery. Mr. McKnight said that all of the information in the statement was false and provided by Wilcox.

200. Eugene Morrow also recounted how Detectives Wilcox and Ryan coerced him into signing a statement implicating Mr. Young. Detectives Wilcox and Ryan arrested Mr. Morrow on an outstanding warrant at his home where he lived with his grandmother and young son. Despite telling Detectives Wilcox and Ryan that it was too dark on the night of the robbery to identify the perpetrators, Detectives Wilcox and Ryan insisted that Mr. Morrow sign a statement identifying Mr. Young. When Mr. Morrow initially refused, Detectives Wilcox and Ryan threatened to arrest his grandmother for harboring a fugitive and send his son to foster care. Under duress, Mr. Morrow signed the statement.

201. Samuel Recard was incarcerated at Midstate Correctional Facility when he received an unexpected visit from Detectives Wilcox and Ryan. Wilcox and Ryan told Mr. Recard that they had arrested Mr. Young for a robbery and recovered a gun that Mr. Young said belonged to Mr. Recard. Wilcox and Ryan then told Mr. Recard that they would arrest him for attempted murder if Mr. Recard refused to implicate Mr. Young in the robbery and shooting. Under threat of new charges and an additional term of imprisonment, Mr. Recard signed a statement that was completely fabricated by Wilcox and Ryan. This statement claimed that Mr. Young confessed that he had been involved in the shooting, that his arm was in a sling at the

23

time he made this confession, and that Mr. Recard knew Mr. Young had been shot, but that Mr. Young didn't talk about it.

202.    In April 2026, after more than 25 years behind bars, Mr. Young's conviction was vacated by Albany County Judge Little, on consent by the Albany District Attorney's Office, and Mr. Young was released from prison. Mr. Young's CPL 440 motion, that was granted by the court, cited Detectives Wilcox's and Ryan's misconduct fabricating false witness statements and testimony.

**1998 and 1999: Carl Dukes and Lavell Jones**

203.    In February 1997, Erik Mitchell was shot and killed in the vestibule of his apartment building.

204.    During the investigation of this murder, Detectives Wilcox, Ryan, and Matos obtained incriminating statements from Carl Dukes and Lavell Jones, implicating themselves in Mitchell's murder.

205.    At the time that Mr. Jones signed his inculpatory statement, Wilcox, Ryan, and Matos had prevented Mr. Jones from eating or sleeping for over two days.

206.    During his trial in 1998, Mr. Jones's attorney presented evidence that Detectives Wilcox, Ryan, and Matos had coerced Mr. Jones by preventing him from eating or sleeping for over two days.

207.    Detective Ryan also obtained a false statement from Mr. Jones's girlfriend after threatening her.

208.    At the same trial, Mr. Jones also recanted his incriminating statement and testified that Detective Matos has pressured him to turn on Mr. Dukes even though Mr. Jones had

24

repeatedly maintained that neither himself nor Mr. Dukes had been involved in the Mitchell murder.

209.    At the time that Mr. Dukes signed his inculpatory statement, Detectives Wilcox and Matos had been interrogating Mr. Dukes for six hours. Prior to the interrogation, Mr. Dukes had been in jail on a separate charge.

210.    During his sentencing in 1999, Mr. Dukes recanted his inculpatory statement and maintained his innocence.

211.    By 1999 at the latest, Detective Wilcox's supervisors and employers at the City were aware of Mr. Jones's and Mr. Dukes's testimony detailing Detectives Wilcox's and Matos's witness coercion.

212.    Despite the lack of physical or forensic evidence tying Mr. Jones and Mr. Dukes to the Mitchell murder, a jury convicted both men.

213.    Eighteen years later, a man named Jeffrey Conrad confessed to the Mitchell murder, including details of the crime that had not been previously revealed to the public.

214.    In 2016, the Albany County District Attorney's office agreed to vacate Mr. Dukes's and Mr. Jones's convictions and dismissed the indictments against them.

215.    Mr. Dukes and Mr. Jones were forced to spend nearly 20 years behind bars as a direct result of Wilcox's, Ryan's and Matos' misconduct.

216.    Mr. Dukes and Mr. Jones each later filed civil rights suits against the City, which were settled in 2021 and 2024, respectively.

**1999: Anthony Ford Taylor**

217.    On April 9, 1999, Daniel Potter was killed in the basement of an apartment building in Albany, New York.

25

218.     The following day, Anthony Ford Taylor was brought to the APD station and interrogated by Detective Wilcox.

219.     During Mr. Taylor's interrogation, Detective Wilcox drafted a document that he later claimed was Mr. Taylor's confession to the Potter murder.

220.     Detective Wilcox also forged Mr. Taylor's signature on the document.

221.     Based on this document, Mr. Taylor was arrested and charged with Mr. Potter's murder.

222.     At Mr. Taylor's trial in 2000, Detective Wilcox testified that Mr. Taylor stated as part of his confession: "I didn't mean for him to die[.]"[1]

223.     Mr. Taylor testified at trial that he never confessed to Detective Wilcox and that he did not sign the purported confession that Detective Wilcox turned over.

224.     At trial, Mr. Taylor's defense attorney showed the jury Mr. Taylor's signature on other documents, such as his lease, to highlight the discrepancies between Mr. Taylor's known signatures and the purported signature on the fabricated confession.

225.     After two hours of deliberation, the jury found Mr. Taylor not guilty of Potter's murder.

226.     Jurors interviewed after the trial said that the verdict was based on their belief that Mr. Taylor had not signed the confession.

227.     By the end of Mr. Taylor's trial in 2000, at the latest, Detective Wilcox's supervisors and employers at the City were aware that Detective Wilcox was forging suspects' confessions, like Mr. Taylor's.

---

[1] Carol DeMare, *Jury Acquits Man in Beating Death*, Times Union (Jan. 19, 2000).

26

228.    When asked about the verdict in 2000, then-Albany Mayor Jerry Jennings suggested that then-Police Chief John C. Nielsen "sit down with the district attorney and find out about the real story."[2]

229.    In April 2000, Mr. Taylor filed a federal lawsuit against Wilcox for fabricating evidence against him.[3]

**1999: Kevin Cherry**

230.    On April 2, 1999, James Ford was shot and killed in his apartment in Albany, New York.

231.    In April 1999, Kevin Cherry went to the APD station to provide information regarding a crime in which he had not been involved.

232.    Once at the station, Mr. Cherry met with Detective Wilcox, who then coerced Mr. Cherry into signing a false statement confessing to Mr. Ford's murder.

233.    Mr. Cherry later stated that Detective Wilcox, who had typed up Mr. Cherry's statement, had fabricated his confession and added inculpatory details regarding Mr. Ford's murder that Mr. Cherry had not offered.

234.    In February 2000, the jury acquitted Mr. Cherry of intentional murder but was deadlocked regarding a lesser murder count.

235.    In April 2000, just a few days before Mr. Cherry's second murder trial was set to start, an individual named Danielle McGrail told police that another individual named Terrence Faulkner had killed James Ford. Ms. McGrail also confessed to acting as the getaway driver for Mr. Faulkner following the murder.

---

[2] Carol DeMare, *Former Defendant Grateful to Jury*, Times Union (Jan. 20, 2000).

[3] Melissa Grace, *$7M Suit Filed Against Detective*, Times Union (Apr. 13, 2000).

27

236.    Following this confession, the Albany County District Attorney's Office dismissed all charges against Mr. Cherry.

237.    By April 2000 at the latest, Detective Wilcox's supervisors and employers at the City were aware that Wilcox had fabricated Cherry's confession to Ford's murder.

***Detective Wilcox's Criminal Activity During His Time at the APD***

238.    Detective Wilcox also engaged in widespread criminal activity during his tenure with the Albany Police Department.

239.    Specifically, Detective Wilcox and a co-conspirator, Aaron Dare, engaged in a long-running fraudulent scheme to flip properties using fake appraisals and forged loan documents.

240.     The Albany Times-Union, summarizing Mr. Dare's testimony in a trial involving another alleged co-conspirator named Ana Monteiro, reported as follows:

> Together, Dare said, he and Wilcox created a maze of similarly named companies to do their real estate closings. Dare's credit was in ruins when they started, in part due to Dare's bankruptcy stemming from his failed leadership of the former Urban League of Northeastern New York, which he drove into financial collapse.
>
> Bank accounts were set up in the names of companies created by Monteiro and Wilcox. Over time, millions of dollars flowed through those accounts, disgorged through teller's checks and ATM withdrawals. They hired a small network of pawn employees, enlisted confederates from the mortgage fraud "industry" and set about bilking banks and sometimes the unsuspecting out of possibly millions of dollars.[4]

241.    After Detective Wilcox died in a car accident in 2006, he was posthumously identified as the unidentified co-conspirator in the indictment against Dare.

---

[4] Mike Goodwin, *Disgraced Aaron Dare tells jury how he and popular cop plotted fraud*, Times Union (Mar. 17, 2010)

28

**FIRST CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Denial of Due Process – Fabrication of Evidence – Malloy Statement
(Against Defendants Garland-Wilcox, Ryan, and Matos)

242.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

243.    Detectives Wilcox, Ryan, and Matos caused the initiation of criminal proceedings against Mr. Craft.

244.    As set forth above, Detectives Wilcox, Ryan, and Matos created false information and fabricated evidence likely to influence the jury by, among other things, coercing Anthony Malloy to adopt a fabricated witness statement inculpating Mr. Craft in the Chambers murder.

245.    Specifically, Detectives Wilcox, Ryan, and Matos fabricated Mr. Malloy's statement that Plaintiff admitted to him that Mr. Craft had committed the Chambers murder.

246.    This fabrication of evidence by Detectives Wilcox, Ryan, and Matos proximately caused Mr. Craft's detention and loss of liberty.

247.    Detectives Wilcox, Ryan, and Matos acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  They acted with the specific intent to deprive Mr. Craft of his constitutional rights.

248.    As a direct and proximate result of Detective Wilcox's, Ryan's, and Matos's misconduct and abuse of authority, Mr. Craft suffered the damages alleged herein.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Fifth/Fourteenth Amendment
*Brady* – Withholding Material Exculpatory Evidence – Malloy Statement
(Against Defendants Garland-Wilcox, Ryan, and Matos)

249.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

250.    Evidence of Detectives Wilcox's, Ryan's, and Matos's coercion of Anthony Malloy and their fabrication of Mr. Malloy's statement inculpating Mr. Craft, was material

exculpatory and impeaching evidence. Had this evidence been disclosed to Mr. Craft, there would have been at least a reasonable probability of a different outcome at trial.

251.     Detectives Wilcox, Ryan, and Matos were aware that Mr. Malloy only identified Mr. Craft as the perpetrator of the Chambers murder after the Detectives coerced Mr. Malloy into falsely naming Mr. Craft as the perpetrator.

252.     Detectives Wilcox, Ryan, and Matos had a duty to share this material, exculpatory and/or impeaching evidence and information to the District Attorney's Office so it could be disclosed to the defense.

253.     Detectives Wilcox, Ryan, Matos did not share this material exculpatory and/or impeaching evidence and information with the District Attorney's Office or otherwise disclose it to the defense.

254.     Detectives Wilcox, Ryan, and Matos acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  They acted with the specific intent to deprive Mr. Craft of his constitutional rights.

255.     As a direct and proximate result of their misconduct and abuse of authority, Mr. Craft suffered the damages alleged herein.

**THIRD CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Failure To Intervene – Malloy Statement
(Against Defendants Garland-Wilcox, Ryan, and Matos)

256.     Plaintiff realleges the above paragraphs as if they were fully set forth here.

257.     To the extent that either Detective Wilcox, Ryan, or Matos was or were not directly responsible for the fabrication of the Malloy Statement and/or withholding of exculpatory evidence surrounding the Malloy Statement, as set forth above, such Defendant(s)

had a realistic opportunity to intervene and prevent misconduct by the other Defendant(s) that caused preventable harm to Mr. Craft.

258. A reasonable police officer in the position of Detectives Wilcox, Ryan, and Matos would have known that Mr. Craft's constitutional rights were being violated by the fabrication of evidence and/or withholding of exculpatory evidence described above.

259. Neither Detective Wilcox, Detective Ryan, nor Detective Matos took a single step to intervene and prevent any of the constitutional violations suffered by Mr. Craft.

260. Detectives Wilcox, Ryan, and Matos acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

261. As a direct and proximate result of their misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

**FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Denial of Due Process – Fabrication of Evidence – Frazier Statement
(Against Defendants Garland-Wilcox and Ryan)

262. Plaintiff realleges the above paragraphs as if they were fully set forth here.

263. Detectives Wilcox and Ryan caused the initiation of criminal proceedings against Mr. Craft.

264. As set forth above, Detectives Wilcox and Ryan created false information and fabricated evidence likely to influence the jury by, among other things, coercing Samuel Frazier to adopt fabricated witness statements inculpating Mr. Craft in the Chambers murder.

265. Specifically, Detectives Wilcox and Ryan fabricated Mr. Frazier's statement that Mr. Craft admitted that he had committed the Chambers murder.

266.    This fabrication of evidence by Detectives Wilcox and Ryan proximately caused Mr. Craft's detention and loss of liberty.

267.    Detectives Wilcox and Ryan acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. They acted with the specific intent to deprive Mr. Craft of his constitutional rights.

268.    As a direct and proximate result of Detective Wilcox's and Ryan's misconduct and abuse of authority, Mr. Craft suffered the damages alleged herein.

## FIFTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fifth/Fourteenth Amendment
*Brady* -Withholding Material Exculpatory Evidence – Frazier Statement
(Against Defendants Garland-Wilcox and Ryan)

269.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

270.    Evidence of Detectives Wilcox's and Ryan's coercion of key prosecution witness Samuel Frazier and their fabrication of Mr. Frazier's statements inculpating Mr. Craft, was material exculpatory and impeaching evidence. Had this evidence been disclosed to Mr. Craft, there would have been at least a reasonable probability of a different outcome at trial.

271.    Detectives Wilcox and Ryan were aware that Mr. Frazier only identified Mr. Craft as the perpetrator of the Chambers murder after the Detectives coerced Mr. Malloy and Mr. Frazier into falsely naming Mr. Craft as the perpetrator.

272.    Detectives Wilcox and Ryan had a duty to share this material, exculpatory and/or impeaching evidence and information to the District Attorney's Office so it could be disclosed to the defense.

273.    Detectives Wilcox and Ryan did not share this material exculpatory and/or impeaching evidence and information with the District Attorney's Office or otherwise disclose it to the defense.

274.     Detectives Wilcox and Ryan acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. They acted with the specific intent to deprive Mr. Craft of his constitutional rights.

275.     As a direct and proximate result of their misconduct and abuse of authority, Mr. Craft suffered the damages alleged herein.

**SIXTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Failure To Intervene – Frazier Statement
(Against Defendants Garland-Wilcox, Ryan, and Matos)

276.     Plaintiff realleges the above paragraphs as if they were fully set forth here.

277.     To the extent that either Detective Wilcox, Ryan, or Matos was or were not directly responsible for the fabrication of the Frazier Statement and/or withholding of exculpatory evidence surrounding the Frazier Statement, as set forth above, such Defendant(s) had a realistic opportunity to intervene and prevent misconduct by the other Defendant(s) that caused preventable harm to Mr. Craft.

278.     A reasonable police officer in the position of Detectives Wilcox, Ryan, and Matos would have known that Mr. Craft's constitutional rights were being violated by the fabrication of the Frazier Statement and/or withholding of exculpatory evidence described above.

279.      Neither Detective Wilcox, Detective Ryan, nor Detective Matos took a single step to intervene and prevent any of the constitutional violations suffered by Mr. Craft.

280.     Detectives Wilcox, Ryan, and Matos acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

281.     As a direct and proximate result of their misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

**SEVENTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Denial of Due Process – Fabrication of Evidence – Craft Admission
(Against Defendant Garland-Wilcox)

282.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

283.    Detective Wilcox caused the initiation of criminal proceedings against Mr. Craft.

284.    As set forth above, Detective Wilcox created false information and fabricated evidence likely to influence the jury when he fabricated Mr. Craft's purported confession that he "didn't mean to kill the girl."

285.    This fabrication of evidence by Detective Wilcox proximately caused Mr. Craft's detention and loss of liberty.

286.    Detective Wilcox acted under pretense and color of state law.  His acts were beyond the scope of his jurisdiction, without authority of law, and in abuse of his powers.  He acted with the specific intent to deprive Mr. Craft of his constitutional rights.

287.    As a direct and proximate result of Detective Wilcox's misconduct and abuse of authority, Mr. Craft suffered the damages alleged herein.

**EIGHTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Failure To Intervene – Craft Admission
(Against Defendants Garland-Wilcox, Ryan, and Matos)

288.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

289.    To the extent that either Detective Wilcox, Ryan or Matos was or were not directly responsible for the fabrication of the Craft Admission, as set forth above, such Defendant(s) had a realistic opportunity to intervene and prevent misconduct by the other Defendant(s) that caused preventable harm to Mr. Craft.

34

290.    A reasonable police officer in the position of Detectives Wilcox, Ryan, and Matos would have known that Mr. Craft's constitutional rights were being violated by the fabrication of evidence and/or withholding of exculpatory evidence described above.

291.    Neither Detective Wilcox, Detective Ryan, and Detective Matos took a single step to intervene and prevent any of the constitutional violations suffered by Mr. Craft.

292.    Detectives Wilcox, Ryan, and Matos acted under pretense and color of state law. Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

293.    As a direct and proximate result of their misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

**NINTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Municipal Liability – Fourth and Fourteenth Amendments
Policy and Custom of Coercive Police Interrogation and Fabricated Witness Statements
(Against Defendant City of Albany)

294.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

295.    Before, during, and after the violation of Plaintiff's constitutional rights, the City of Albany had a policy or custom of unconstitutional investigative techniques, including coercion of witnesses, fabrication of inculpatory evidence, destruction of evidence, and suppression of exculpatory evidence.

296.    Kenneth Wilcox, Anthony Ryan, and Ronald Matos acted consistently with and pursuant to the City's policy or custom when they engaged in their conduct set forth above.

297.    Additionally, before, during, and after the violation of Plaintiff's constitutional rights, the City of Albany, as a matter of custom, practice or policy, failed to supervise and discipline police officers to prevent, deter, and punish their unconstitutional fabrication of evidence, coercion of witnesses, and suppression of material exculpatory information.

35

298.    The City was aware of, permitted, tolerated, and was deliberately indifferent to the dangerous propensities of Detectives Wilcox's, Ryan's, and Matos's APD detectives' coercive techniques, fabrication of evidence, and withholding of evidence but took no steps to supervise them, correct their abuses of authority, or discourage their unlawful uses of authority.

299.    To the contrary, The City condoned and acquiesced in Detective Wilcox's, Ryan's, and Matos's abuses of authority by refusing to supervise them, discipline them, or otherwise correct their abusive behavior.

300.    Upon information and belief, Detectives Wilcox, Ryan, and Matos were never formally disciplined by the APD at any point prior to the Chambers murder investigation, nor were they disciplined for their conduct during the Chambers murder investigation.

301.    The City was or should have been aware that its failure to supervise and discipline its police officers, who regularly violated the civil rights of citizens, including by fabricating evidence, coercing witnesses, and suppressing material exculpatory evidence, was obviously inadequate.

302.    The City was or should have been aware that its failure to correct its police officers' conduct would result in further incidents of dangerous and lawless conduct perpetrated by their officers.

303.    The City's constitutionally deficient supervision and discipline of Detectives Wilcox, Ryan, and Matos, was done with deliberate indifference to the rights of Plaintiff and others in his position.

304.    The City, acting under color of state law, violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

36

305.    As a direct and proximate result of the City's policy or custom, Plaintiff suffered the damages alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

    a.    Compensatory damages against all Defendants in an amount to be determined at trial;

    b.    Punitive damages against Defendants Wilcox and Ryan in an amount to be determined at trial;

    c.    Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

    d.    Such other and further relief as this Court may deem just and proper.

Dated:  New York, New York          EMERY CELLI BRINCKERHOFFF
       April 20, 2026              ABADY WARD & MAAZEL LLP

_____
Earl S. Ward
Julia P. Kuan
Nick Bourland
Sydney Zazzaro

One Rockefeller Plaza, 8th Floor
New York, New York 10020
eward@ecbawm.com
jkuan@ecbawm.com
nbourland@ecbawm.com
szazzaro@ecbawm.com
(212) 763-5000

*Attorneys for Plaintiff Sherodd Craft*

37